**UNIFLOW MANUFACTURING CO. and Jefferson Ice Company, Appellants,**

v.

**KING–SEELEY THERMOS CO.,**
**Appellee.**

**No. 19825.**

United States Court of Appeals,
Sixth Circuit.

June 18, 1970.

Robert F. Conrad, Washington, D. C., Charles R. Rutherford, Whittemore, Hulbert & Belknap, Detroit, Mich., on the brief; Charles L. Lovercheck, Erie, Pa., Arthur I. Neustadt, Washington, D. C., of counsel, for appellants.

Don K. Harness, Detroit, Mich., Cyrus G. Minkler, Harness, Dickey & Pierce, Detroit, Mich., on the brief, for appellee.

Before PHILLIPS, Chief Judge, and PECK and BROOKS, Circuit Judges.

PHILLIPS, Chief Judge.

This case involves the issue of infringement of a patent for an ice making machine. Appellant Uniflow Manufacturing Company (Uniflow) brought the action under 28 U.S.C. § 2201 for a declaratory judgment that U.S. Patent 2,753,694 (the 694 patent) owned by appellee King-Seeley Thermos Company (King-Seeley) was invalid and not infringed by Uniflow's ice making machine. Jefferson Ice Company, a distributor for Uniflow's products, intervened as a third-party plaintiff. King-Seeley counter-claimed, charging Uniflow and Jefferson Ice Company with infringement of claim 4 of the 694 patent.

At trial Uniflow did not contest the validity of claim 4 of the 694 patent (the only part of the patent that King-Seeley charged was infringed), but contended that claim 4 as limited by the prior art was not infringed by the Uniflow machine.

District Judge Thomas D. Lambros held claim 4 of the 694 patent to be infringed by the Uniflow machine. He granted a protective injunction on the counter-claim and an accounting for damages, as well as attorneys' fees to King-Seeley. By stipulation of the parties bond has been posted in lieu of the issuance of the injunction. Uniflow appeals from the judgment under 28 U.S. C. § 1292(a) (4).

To understand the patent involved here and the nature of this controversy it is necessary to examine the history of the flake ice making art. There are basically two kinds of ice making machines: those that produce formed or cube ice and those that produce flake or chipped ice. This appeal is concerned with the latter type. In this opinion we will refer to the King-Seeley patented machine as the Trow machine after its inventor and the accused Uniflow machine as the Kuebler machine after its inventor.

Prior to the introduction of the flake ice machines most of the ice used by restaurants, drug stores and similar establishments was either cubed ice or ice that was crushed or chipped from larger blocks supplied by commercial ice supply

houses. Flake ice for purposes of this discussion is ice composed of small flakes or chips having a sufficiently high ice to water ratio that when placed in a storage bin it will not stick or mat together and easily can be scooped or measured.

By using one of the flake ice machines, a small establishment can manufacture its own flake ice at about one-tenth of the cost that previously was required to purchase the crushed or chipped ice from a commercial ice producer.

### The Prior Art Nitsch Machine

Prior to the invention of the Trow machine involved here a flake ice machine had been produced by Nitsch. The Nitsch machine as well as the two machines here involved were designed to freeze water on the interior wall of a chilled hollow cylinder. Chilling was accomplished by wrapping the outside of the cylinder with refrigerating coils similar to the ones in the ordinary domestic refrigerator. The metal cylinder positioned vertically was closed on the lower end with the upper end open. Water flowed into the cylinder and solidified into ice on the interior wall of the cylinder. A spiral shaped screw or auger is positioned in the center of the cylinder, situated so that as it was rotated by a motor mounted on the exterior of the cylinder. The edge of the auger scraped the ice from the wall of the cylinder. The ice rose on the spiral of the auger to the top of the machine as the auger rotated. The ice reaching the top was discharged into a storage bin.

The Nitsch machine never achieved significant commercial success because it contained a serious defect. If too many water droplets were trapped between the particles of ice, the ice would lump together and form a slushy ice that was not marketable. On the other hand if the ice flaked from the cylinder wall did not contain enough water, a mass was formed causing the auger to jam. Although there was a very narrow range in which the machine could oper-

ate, varying types of water in different parts of the country, which freeze at different rates, caused a serious problem of keeping the machine adjusted properly. The balance necessary to produce saleable ice in the Nitsch machine kept it from being commercially successful.

Both the Trow machine and the Kuebler machine were designed to produce saleable ice without jamming, by a method other than regulating the amount of water between the flaked ice.

### The Trow Machine

The Trow machine operates in a manner similar to the Nitsch machine, with the frozen ice mixed with water rising in the cylinder due to the rotation of the spiral auger. At the upper end of the cylinder a "breakerhead" is mounted so that the rising ice is conveyed against the underside of a mold-board-like surface. The pressure of the slushy ice produced by the force upward by the spiral auger is sufficient to press the ice against the "breakerhead" and force most of the water from the ice and compress the ice so that when discharged into the storage bin it has a 70–30 or 80–20 ratio of ice to water. The "breakerhead" also breaks the ice into small compact chips or flakes. The demonstration of the machine to the District Court showed that, absent the "breakerhead," the Trow machine would produce only a slushy ice generally similar to that produced by the Nitsch machine, which is not marketable as flake ice.

The combination in the Trow invention of the prior art and the "breakerhead" for the first time made possible an inexpensive machine that would produce saleable flake ice, in sufficient quantities and with enough reliability to be practical commercially.

The significance of this invention is reflected in the number of machines produced and marketed by King-Seeley. It is also reflected in the number of companies that have sought to copy the Trow machine. King-Seeley's patent and especially claim 4 thereof has been found valid in a number of reported decisions,

including one from this Circuit: King-Seeley Thermos Co. v. Millersville Mfg. Co., 296 F.Supp. 247 (M.D.Tenn.1968), aff'd, 412 F.2d 318 (6th Cir.); King-Seeley Thermos Co. v. Tastee Freez Industries, Inc., 357 F.2d 875 (7th Cir.); King-Seeley Thermos Co. v. Refrigerated Dispensers, Inc., 354 F.2d 533 (10th Cir.); King-Seeley Corp. v. Cold Corp. of America, 182 F.Supp. 768 (N.D.Ill.).

These decisions generally define the patented concept in the Trow machine as being a machine that produces commercially acceptable flake ice by mating the freezing idea of the Nitsch machine with a "breakerhead" which dewaters and compresses the ice into small compact pieces which then are discharged into the storage bin.

### The Kuebler Machine

The Kuebler machine (Uniflow's accused device) also operates on the basic freezing method of the Nitsch machine. The water level in the Kuebler machine is lower than in the Trow machine. At the upper end of the Kuebler machine there is positioned a "deflector" which Uniflow contends operates on a different principle than the Trow "breakerhead." It is contended that the "deflector" causes the ice flaked from the cylinder wall to rotate more rapidly while moving upward and that this rotation of the ice in the cylinder, above the water level, produces ice at the "deflector" with less water content and that the ice is so dry that no dewatering is necessary. Uniflow contends that its "deflector" in addition to providing rotation merely breaks up the ice and forces it into the storage bin. During the demonstration before the District Judge, it was observed that some water did flow from the ice hitting the "deflector."

### Claim 4 of the 694 patent

The parties limited the controversy at trial to the scope of claim 4 of the 694 patent and whether that claim was infringed by the Kuebler machine.

Claim 4 of the 694 patent reads:

(a) "4. An ice chip producing machine comprising

(b) an elongated freezing chamber having an open end,

(c) means for supplying water to the inside of said freezing chamber,

(d) means for cooling at least a portion of said freezing chamber to freeze ice on the inside surface thereof,

(e) an ice conveying auger rotatably mounted in the freezing chamber with its spiral edge disposed in closely spaced relation to the inside wall of said chamber,

(f) means for constantly rotating the auger to cause said spiral edge to shear off ice frozen on the inside wall of the chamber constantly to deliver ice to said open end of the freezing chamber,

(g) and an outwardly inclined ice disintegrating and removing member positioned in said open end of the chamber and provided with an ice peeling mold-board-like surface positioned to engage ice carried by the auger,

(h) said constant rotation of the auger serving positively and constantly to convey ice to and force it against said mold-board-like surface to break up and positively remove ice from the auger and discharge it as discrete ice chips."

King-Seeley and Uniflow produced expert witnesses whose qualifications were not assailed. Both experts testified as to the method of operation of the respective machines, and demonstrated the machines to the court. The District Judge thus had the benefit of observing the demonstrations of the machines as well as being able to evaluate testimony of the experts as they explained the operations of the machines.

Uniflow contends that its "deflector" serves to impart rotation to the ice and by this rotation the ice remains in the cylinder longer and thus is hard ice at the time it reaches the top of the cylin-

der and has no need of the dewatering "breakerhead" that is the essence of the King-Seeley patent. Reliance is placed on *Millersville Mfg. Co., supra,* as support for the proposition that to infringe the King-Seeley patent that, "the device must dewater slushy ice at the breakerhead." In *Millersville* the freezing cylinder contained a tapered auger so that as the ice rose in the cylinder the water was forced from the ice and by the time that it reached the top of the cylinder it was dry or saleable. In *Millersville* the District Court found that the accused machine, with the deflector cap (similar to the accused "deflector" here) removed, still made saleable ice. King-Seeley Thermos Co. v. Millersville Mfg. Co., 296 F.Supp. 247 (M.D.Tenn.). The District Court noted "that test made on defendant's machine without the deflector cap showed that it would produce commercially usable ice; further, that there was no noticeable difference between the dryness of the chips produced with the deflector cap removed or in place." Id. at 251. In *Millersville* the "deflector cap" merely forced the ice into cutting blades that chipped it prior to discharge into the storage bin.

King-Seeley at trial and on appeal contends that the "deflector" of the accused machine in fact does some dewatering and is used for the same purpose as the "breakerhead" in its patented machine.

The District Judge found:

"I find as a fact that from the testimony of the two aforementioned experts there is a conflict in the testimony as to whether or not sections (g) and (h) of Claim 4 of the patent in suit read upon the accused device.

"From the demonstrations conducted in the jury room by the Plaintiff and the Defendant on the machines manufactured by the Plaintiff and by the Defendant, I find that the function and operation of the ice making machines covered by the patent in suit and the function and operation of the ice making machines covered by Kuebler Patent No. 3,319,438 are substan-

tially identical and that the ice flakes produced by the machine covered by the patent in suit and the accused device are practically identical in substance and in design. And from the jury room demonstration I resolve the conflict in the testimony of the experts as to sections (g) and (h) of Claim 4 by finding as a fact that Claim 4 of the patent in suit literally reads on the accused device.

"I find as a fact that mold-boards consist of multiple types of surfaces, to the extent that a mold-board-like surface, as recited in Claim 4, could include any type of surface that could or would be so positioned as to engage the ice that rides up onto this surface by the action of the auger in the chamber while the accused ice making machine and/or the ice making machine manufactured in accordance with the patent in suit are/is in operation. I further find that Claim 4 of the patent in suit is valid and infringed by the accused machine manufactured by the Plaintiff and by the accused machines in the possession of the Third Party Plaintiff."

Uniflow contends that there is no conflicting testimony in this record and that only issues of law are presented on this appeal. An examination of the appendices reveals to our satisfaction that conflicting testimony was presented before the District Judge.

King-Seeley's expert, Dr. Colburn, testified in regard to the Trow machine that:

"So, there's a breaking in the same sense as there is in the defendant's machine. *The water drains down between the layers.* These broken up pieces are compacted by the compression which is occasioned by the ice being pushed up against that floating ramp ["deflector"]. So, the pieces that were originally broken are compressed into little chips of a different shape and size. *Some water is squeezed out, some water drains out.* These pieces are then deflected out

through the delivery shoot, 22." (Emphasis added.)

The Uniflow expert testified in regard to the same machine:

"The Court: It is your position that there is no compression in the delivery of the ice?

A. The ice is hard enough, firm enough by the time it is in the path of the auger, *there is no compression in the form of squeezing and dewatering the ice.* There is no need for compression. It is already 80%, approximately 80% ice by the time it reaches up between the flight, the top flight of the auger and the head.

The Court: Your answer is that there is no compression?

A. There is no compression and dewatering." (Emphasis added.)

There was also a conflict as to whether Uniflow's deflector compressed the ice causing it to crack, which produced the following exchange:

King-Seeley's counsel:

"Assuming we follow your theory that there is no compression whatsoever in your machine, is that right? A. It's not only a theory, it's a fact.

"Q. Let me ask you this question. If in viewing your device in operation through a plastic sleeve where I can see it, what's happening? If I see any fracture or cracking of the ice coming up against the underside of that ramp, can you tell me what would cause that fracturing or cracking other than a compressive force? A. We showed that there was no fracturing or cracking when we peeled the ice off, the ice directly under the head was not fractured. We showed when we took your head off that the ice was fractured.

"Q. I'm talking about looking in through the plastic tube. What I would see with my eye as I look in there at the ice rising up in that plastic tube, if I saw the fracturing or cracking, it could only be caused, that fracturing or cracking effect could only be caused by compressive force

being caused by the engagement of the ice between the auger flights and the underside of the deflector heads, isn't that right? A. We didn't see fracture.

"Q. I didn't ask you if you saw it. I asked you if it was a fact if I did see it and I think I saw it.

"The Court: *I know I saw it.*" (Emphasis added.)

The finding by the District Judge that there was a conflict in the testimony of the experts is a finding of fact as is his finding of infringement. Findings of fact of a trial judge in a patent case can only be overturned on appeal if the reviewing court finds them to be clearly erroneous. Rule 52(a), Fed.R.Civ.P.; Maytag Co. v. Murray Corp. of America, 318 F.2d 79 (6th Cir.) and cases cited therein at page 82.

Having examined the evidence before the District Court and giving due regard to the fact that the District Judge saw the machines in operation and observed the witnesses as they explained the machines, we do not find that his conclusions as to the conflict of testimony, the validity of the 694 patent or the infringement of claim 4 thereof by the accused machine to be clearly erroneous.

We therefore affirm the decision of the District Court in regard to the findings of validity and infringement.

*Attorneys' Fees*

The District Court in its conclusions of law held: "That the Defendants, King-Seeley Thermos Co., be awarded its taxable costs and reasonable attorneys' fees." Uniflow contends that the court erred in awarding attorneys' fees without making a specific finding that the case was an exceptional case under 35 U.S.C. § 285. This statute provides: "The court in exceptional cases may award reasonable attorney fees to the prevailing party."

Uniflow contends correctly that the awarding of fees is the exception and not the rule. Monolith Portland Midwest Co. v. Kaiser Aluminum &

Chemical Corp., 407 F.2d 288 (9th Cir.); Hoge Warren Zimmerman Co. v. Nourse & Co., 293 F.2d 779 (6th Cir.). It is argued that fees should be awarded in cases where the conduct of the losing party may be characterized as unfair and vexatious or involves bad faith or some other equitable consideration that would make it unjust for the party prevailing to have to bear its own attorneys' fees, citing Henry J. Kaiser Co. v. McLouth Steel Corp., 257 F.Supp. 372, aff'd, Kaiser Industries Co. v. McLouth Steel Corp., 400 F.2d 36 (6th Cir.), cert. denied, 396 U.S. 1119, 89 S.Ct. 992, 22 L.Ed.2d 124. It is contended that the absence of a finding of these factors by the District Court precludes the affirmance of the award.

King-Seeley contends that this is the type of case that the statute was intended to cover. It is argued that the award of fees was made under the statute, within the sound discretion of the District Judge and should not be reversed unless found to be capricious or erroneous as a matter of law. Reliance is placed upon Turchan v. Cincinnati Milling Machine Co., 208 F.2d 228 (6th Cir.). In that case fees were denied and this court affirmed the denial, holding it to be a valid exercise of the discretion of the District Court. The question on the present appeal is whether an award of fees can be upheld absent a specific finding of bad faith or some similar criteria. This question not answered in *Turchan.*

This Court has had occasion to examine 35 U.S.C. § 285, Hoge Warren Zimmerman Co. v. Nourse & Co., *supra,* 293 F.2d 779 (6th Cir.), saying:

"[I]n relation to section 285 the cases are in accord that its application is discretionary with the District Court. Former section 70 so provided, and it has been held that the substitution of the phrase 'in exceptional cases' has not done away with the discretionary feature. 'Both before and after the change in wording this Court has interpreted this section as making the trial court's determina-

tion of attorney's fees final *where it has clearly stated the basis for the award,* "except where there is an abuse of discretion amounting to caprice or an erroneous conception of the law on the part of the trial judge." ' Talon, Inc. v. Union Slide Fastener, 9 Cir., 1959, 266 F.2d 731, 739; Carolina Lee Knitting v. Johnson & Johnson, 4 Cir., 1960, 275 F.2d 91. Also see the discussion of this subject by Judge O'Sullivan of this Court in an opinion by him as a district judge, cited as Clinton Engines Corp. v. Briggs & Stratton, D.C.1959, 175 F.Supp. 390, 401–403. It is clear from the cases decided under section 285 that the determination of the district court will not be upset unless there has been an abuse of discretion. * * *

"[E]xceptional circumstances have been interpreted as incorporating concepts of fraud, malice, bad faith and other similar concepts, * * *" (Emphasis added.) 293 F.2d at 783–784.

The cases that have spoken to this question indicate that for an award of attorneys' fees to be upheld the trial court must have found unfairness, bad faith or inequitable or unconscionable conduct on the part of the losing party. Purer & Co. v. Aktiebolaget Addo, 410 F.2d 871, 880 (9th Cir.), cert. denied, 396 U.S. 834, 90 S.Ct. 90, 24 L.Ed.2d 84; Rohr Aircraft Corp. v. Rubber Teck Inc., 266 F.2d 613, 624 (9th Cir.); Glen Mfg. Inc. v. Perfect Fit Industries, Inc., 299 F.Supp. 278, 285 (S.D.N.Y.1969); See also Minnesota Mining & Mfg. Co. v. Norton Co., 426 F.2d 1117 (6th Cir.). No such finding was made by the District Court in the present case.

Absent a specific finding by the District Court that would bring the case within the definition of the term "exceptional case" as set forth in 35 U.S.C. § 285 and interpreted by the cases set forth above, we hold that the award of attorneys' fees cannot stand.

We therefore reverse the decision of the District Court in regard to its award of attorneys' fees.

The decision of the District Court is affirmed in regard to its findings of the validity of the 694 patent and infringement by the accused machine.

The case is remanded for further proceedings not inconsistent with this opinion.